[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13841
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 20, 2011
JOHN LEY
CLERK

D. C. Docket No. 4:10-cr-00092-WTM-GRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN L. DELVALLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(September 20, 2011)

Before HULL and ANDERSON, Circuit Judges, and VINSON,[*] District Judge.

PER CURIAM:

_____

[*]Honorable C. Roger Vinson, United States District Court for the Northern District of Florida, sitting by designation.

Juan L. Delvalle ("Delvalle") appeals his conviction and 120-month sentence for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Delvalle contends that the district court's response to a jury question about his stipulation that the firearm had traveled in interstate commerce confused the jury and allowed them to infer improperly that he had prior personal knowledge of the firearm. For the reasons set forth below, we agree the district court erred in how it answered the jury's question and the error was not harmless. Thus, we reverse and remand for a new trial.

## I. BACKGROUND

### A. Government's Evidence at Trial

On January 26, 2010, ten members of the Special Weapons and Tactics Team ("SWAT") of the Savannah-Chatham Metropolitan Police Department ("the police") went to execute a search warrant at a house located at 502 East Montgomery Crossroads, where Defendant Delvalle, who was previously convicted of a felony, lived. The police had received information that Delvalle was in possession of an AK-47 firearm. As discussed later, Delvalle lived at this house with his mother Zaida.

In accordance with the SWAT plan for executing the warrant, the team members positioned themselves at different locations around Delvalle's house.

2

Sergeant Woodward and Officer Lyttle waited outside Delvalle's bedroom window. The rest of the team went to the front door of Delvalle's house.

Both Officers Woodward and Lyttle testified at trial. Officer Lyttle testified that he had to climb over an eight-foot chain-link fence to reach his location. Once positioned, Officers Lyttle and Woodward stated that they could see a person sitting on a bed; Woodward later identified the person in court as Delvalle. As the officers watched, Delvalle got up, stood briefly in front of the window, and then bent over as if he was reaching for something. Officer Woodward then broke the window glass of the bedroom with his rifle and yelled, "Police, get down." According to Woodward's testimony, Delvalle then ran and exited the bedroom. One of the other officers seized Delvalle near the front door, after he observed him running from a back room toward the front of the house.

Officer Lyttle testified that when he entered the bedroom, he saw the AK-47 firearm in the area where he saw Delvalle reaching. The magazine was not in the firearm, but instead was located under the port of the firearm. The magazine contained live rounds. Neither officer saw Delvalle actually hold the firearm. At trial, an employee of the police department, who had been detailed to the Bureau of Alcohol, Tobacco, and Firearms, testified that the Bureau had tested the AK-47 firearm and determined it functioned as designed.

The only issue at trial was whether Delvalle "knowingly possessed" the AK-47 firearm, as Delvalle stipulated to the other two elements of the offense. His stipulation stated that he had a prior felony conviction and the firearm in the indictment had been transported in interstate commerce, as follows:

> 1. Prior to January 16, 2010, Juan L. Delvalle was a person who had been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year as charged in the indictment; and,
> 2. That the firearm listed in the indictment; that is, a B-West, 7.62x39 caliber, model AK 47S semi-automatic rifle, serial number 9992050, which had prior thereto been transported in interstate commerce from Arizona to Georgia prior to January 26, 2010.

After the government read the stipulation to the jury, the court explained to them the meaning of a stipulation.

## B.    Defendant's Evidence at Trial

Delvalle's defense theory was that his sister, Mandy Delvalle ("Mandy"), had planted the AK-47 firearm in his bedroom and tipped the police in an attempt to help her boyfriend get out of trouble.

Delvalle first called Officer Woodward for further cross-exam. Delvalle then called his mother Zaida as a witness. Zaida testified that, until a few weeks prior to the search warrant execution, Mandy had lived with Delvalle and her at Zaida's home at 502 East Montgomery Crossroads. Zaida stated that she forced

4

Mandy to leave because Mandy repeatedly sneaked her boyfriend into the house to spend the night, contrary to Zaida's orders. Zaida did not want the boyfriend around because she believed he had problems with the police, and used and sold drugs.

On January 25, 2010 (the day before the search), Zaida left work and went home after a neighbor, Miguel Sosa ("Sosa"), called her. Zaida stated that the back door, which entered into Delvalle's bedroom, was open when she got home. Due to a problem with the lock, Zaida had been unable to lock the back door. Mandy had already removed all of her belongings from the house at that time.

Neighbor Sosa testified that on January 26, 2010, he called Zaida again because he saw Mandy leaning a ladder against the fence that surrounded Zaida's backyard. However, Sosa did not observe Mandy cross the fence into the property. There was no testimony by Sosa about Mandy having a firearm.

Delvalle also called his father, Juan Delvalle, Senior, to testify. His father, however, had little relevant testimony.

Finally, Jacqueline Smith ("Smith"), a report writer for the police department, testified that on January 25, 2010, she received a call at home from her daughter, letting her know that Mandy wanted to talk to her. Smith told

5

Mandy that she did not file reports at home, and that Mandy would need to go to the police precinct if she wanted to file a report.

## C. Jury Instructions

After the close of evidence,[1] the district court instructed the jury, in relevant part, that the government must prove beyond a reasonable doubt that the defendant knowingly possessed a firearm as follows:

> The defendant can be found guilty of [a violation of 18 U.S.C. § 922(g)] only if all of the following facts are proved beyond a reasonable doubt:
> First: that the defendant knowingly possessed a firearm in or affecting interstate commerce, as charged; and
> Second: that before the defendant possessed the firearm the defendant had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, that is, a felony offense.

The district court also explained Delvalle's stipulation:

> In this case, the parties have entered into agreement as to certain facts – that is, they have agreed that certain things are true. These agreements are referred to as stipulations of fact. A stipulation of facts that the parties have agreed to is in evidence and you may have them with you during your deliberations. You should accept these stipulations as true without the need for further evidence of the facts stated.
> In this case, the parties have stipulated that the weapon found was a firearm in or affecting interstate commerce and that, prior to January 26, 2010, the defendant had been convicted of a felony. Therefore, you

---

[1]Delvalle did not testify.

should accept those stipulations as true without the need for further evidence of those facts.

Additionally, the district court explained the concepts of actual and constructive possession:

> The word "knowingly," as that term is used in the indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.
> The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may also have sole possession or joint possession.
> A person who knowingly has direct physical control of something is then in actual possession of it.
> A person who is not in actual possession but who has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it.
> If one person alone has possession of something, that possession is sole. If two or more persons share possession, such possession is joint. But just being present with others who had possession is not enough. The government must prove beyond a reasonable doubt that the defendant knowingly had either actual or constructive possession of the firearm for you to find him guilty.
> Whenever the word "possession" has been used in these instructions it includes constructive as well as actual possession, and also joint as well as sole possession.

Neither party objected to those instructions. The jury retired to deliberate at 10:16 AM.

## D.    Jury Question No. 1

At 11:38 AM, the jury asked its first question, which read: "Please clarify constructive possession. Does there have to be evidence that the defendant <u>knew</u>

7

the gun was in the house?" Without objection from defense counsel, the district court responded that the defendant must knowingly possess the firearm and defined "knowingly" as follows:

> The statute requires that the defendant knowingly possessed a firearm in or affecting interstate commerce as charged. See jury instructions, Page 8. The word "knowingly," as that term is used in the indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident. See jury instructions, Page 9.

## E.    Jury Question No. 2 and <u>Allen</u> Charge

At 12:10 PM, the jury sent its second question, requesting transcripts of the police testimony. The district court replied to the jury that no real time transcript of the testimony was available. Neither party objected to this response.

At 1:18 PM, the jury requested to be declared a hung jury. The district court then asked the parties if they wanted the court to give an <u>Allen</u> charge. After counsel had time to discuss it among themselves, the court asked if they wanted to know the jury's numerical division. As the government did, the court instructed a security officer to obtain the information. Delvalle did not object to the inquiry. The court informed counsel of the numerical division (8 guilty; 4 not guilty) and then inquired whether they wanted an <u>Allen</u> charge or a mistrial declared. The government requested the charge, and Delvalle opposed it. Subsequently, the

8

court issued the <u>Allen</u> charge to the jury. At 1:30 PM, the jury returned to deliberation.

**F.     Jury Question No. 3**

At 3:04 PM, the jury sent a third question in three parts: (1) "Sir–Does Juan's [Devalle] signature on the stipulation show that Juan knew this particular gun came from Arizona?"; (2) "Does this show that he knew this gun prior to his arrest?";[2] and (3) "Does Juan's signature show that he is familiar with this gun in any way prior to his arrest?"

> The district court proposed the following response to counsel:
>
> [Part 1] The Defendant's signature on the stipulation acknowledges that he agrees that the firearm had been transported in interstate commerce from Arizona to Georgia prior to January 26, 2010.
> [Part 2] This is a question for the jury to decide.
> [Part 3] This is a question for the jury to decide. I remind you again that a stipulation represents facts agreed to by the Government and the Defendant, and that these facts do not require any further proof. The Defendant had stipulated only to the information contained in paragraphs 1 and 2 of the stipulation.

---

[2]Although the actual jury note stated this, the district court informed counsel that the note said "Does this show that he knew this gun?"

9

The government objected to the first answer, and in response, the court added the sentence "The Court refers you to the elements of the charged offense contained on page 8 of the jury instructions" to the end of the first part.

Delvalle also asked the district court to change its answer to the first part. Specifically, Delvalle asked the court to add the phrase "listed in the indictment" after the word "firearm." The court denied Delvalle's request, stating the wording might confuse the jury as there was "only one firearm in the indictment, and the evidence only dealt with one firearm." At one point, Delvalle stressed that the stipulation "doesn't mean he knew anything about the firearm." Although Delvalle continued to express concern about the court's particular answer to the first part, no other specific objection was made to parts 2 and 3 of the court's answer to Jury Question No. 3. The court ended the discussion and sent the response in writing to the jury.

At 4:02 PM, after receiving another note that the jury was deadlocked, the district court ordered the jury back to the jury box. However, the foreperson stated the jury was "perhaps ready to do another vote immediately." The court asked the jury to try to reach a verdict and dismissed them to return to deliberations. At 4:34 PM, the jury returned a unanimous verdict, finding Delvalle guilty of violating 18 U.S.C. § 922(g)(1).

Delvalle timely filed a motion for a new trial, which the district court denied. Subsequently, the court sentenced Delvalle to 120 months' imprisonment.

Delvalle timely appealed. On appeal, Delvalle argues the district court's responses to Jury Question No. 3 misled and prejudiced the jury, requiring a new trial. Delvalle focuses, however, mainly on the second and third parts of Question 3.

## II. STANDARD OF REVIEW

When, as here, the defendant in the district court did not object to the second and third parts of Jury Question No. 3, this Court reviews only for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). Under the plain error standard of review, we may not correct an error raised for the first time on appeal unless the defendant shows (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. Plain error review should be exercised "sparingly," Jones v. United States, 527 U.S. 373, 389, 119 S. Ct. 2090, 2012 (1999), and only "in those circumstances in which a miscarriage of justice would

11

otherwise result." United States v. Olano, 507 U.S. 725, 736, 113 S. Ct. 1770, 1779 (1993) (quotation marks omitted).

Where a defendant challenges a court's response to a jury question, "[a]n appellate court must examine the entire jury charge and determine whether, taken as a whole, the issues and law presented to the jury were adequate." United States v. Roper, 874 F.2d 782, 790 (11th Cir. 1989). Though a district court has considerable discretion in determining how to respond to jury questions, it may not misstate the law or confuse the jury. See United States v. Lopez, 590 F.3d 1238, 1247-48 (11th Cir. 2009).

## III. DISCUSSION

We first conclude the district court erred in its response to the second and third parts of Jury Question No. 3. The second part stated: "Does [Delvalle's signature on the stipulation] show that he knew this gun prior to his arrest?" The third part stated: "Does Juan's signature show that he is familiar with this gun in any way prior to his arrest?" The district court effectively responded that it was for the jury to decide whether the stipulation and Delvalle's signature thereon showed Delvalle was familiar with the firearm.

However, Defendant Delvalle's stipulation and signature on the stipulation were not any evidence of his knowledge of the AK-47 firearm, much less his

12

knowing possession of the firearm on January 26, 2010. The district court's answer invited the jury to decide that Delvalle's signature on the stipulation provided evidence of his familiarity, and thus knowledge, of the AK-47 firearm before his arrest. This was error. See United States v. Hellman, 560 F.2d 1235, 1236 (5th Cir. 1977) (finding plain error and reversing where the court instructed the jury to use the stipulation in a manner beyond the stipulation's purpose).[3]

Moreover, this error was plain, because the stipulation and its effect went only to the interstate commerce and prior felony conviction elements. A stipulation serves as proof only of the facts stated in the stipulation, and no more. The district court should have told the jury Delvalle's stipulation and signature thereon were not evidence of knowledge or familiarity of this firearm. It was only evidence the firearm at some point earlier had traveled in interstate commerce. The district court not only failed to give correct answers to the question, but compounded the error by giving answers that allowed the jury to use the stipulation and signature thereon as evidence of Delvalle's knowledge.

The error also affected Delvalle's substantial rights, as there is a reasonable probability of a different result absent the error. See Rodriguez, 398 F.3d at 1299

---

[3]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(noting "reasonable probability" "means a probability 'sufficient to undermine confidence in the outcome'" (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, 124 S. Ct. 2333, 2340 (2004))).  The jury had only one issue to decide: did Delvalle knowingly possess the AK-47 firearm.  The government's evidence on this point cannot be deemed overwhelming.  Indeed, the jury's deliberations on that one issue lasted over six hours, and it twice declared its inability to reach a verdict.  Further, of the jury's three questions, two concerned the knowledge element.  The close connection in time between the court's erroneous response and the end of the jury's day-long struggle with the knowledge element also suggests the court's erroneous response likely impacted the jury verdict.

Finally, the error here went to the heart of the matter and seriously affected the fairness of the proceedings.

Accordingly, we vacate Delvalle's conviction and sentence, and remand for a new trial.

**VACATED AND REMANDED.**